## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ZADIE SANDIFER WATKINS**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5: 11-cv-4261-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On May 13, 2009, the claimant, Zadie Sandifer Watkins, applied for disability insurance

benefits under Title II of the Social Security Act (R. 126, 150-152) and supplemental security income

benefits under Title XVI of the Social Security Act (R. 128, 146-149). The claimant alleges disability

commencing on April 15, 2009 because of symptoms and limitations related to diabetes mellitus,

diabetic neuropathy, degenerative disc disease of the cervical and lumbar spine, and chronic and

severe pain. (R. 23). These applications were denied by the Commissioner of the Social Security

Administration on September 17, 2009. (R. 130-132).  The claimant filed a timely request for a

hearing before an Administrative Law Judge, and the ALJ held a hearing on April 11, 2011. (R. 108).

In a decision dated May 13, 2011, the ALJ found that the claimant was not disabled as defined by

the Social Security Act and, thus, was ineligible for supplemental security income. (R. 27). On

October 21, 2011, the Appeals Council denied the claimant's request for review; consequently, the

ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents three issues: 1) whether the ALJ committed a reversible error when he gave more weight to the state agency physician, Dr. Heilpern's opinion, than the claimant's treating physician, Dr. Fail's treatment note regarding the chiropractor's ten pound weight restriction; 2) whether the ALJ properly applied the Eleventh Circuit's pain standard in discrediting the claimant's subjective testimony of alleged severity of her pain and symptoms; and 3) whether the ALJ properly determined the claimant's residual functional capacity as light exertion level.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

2

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In determining whether the claimant's symptoms and impairments are severe enough to require disability, the claimant bears the burden of providing medical and other evidence to prove her alleged disability. 20 C.F.R.§§ 416.912(a), (c); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (citing 42 U.S.C. § 423(d)(5)(A)). In evaluating pain and other subjective complaints, the

3

ALJ must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1125-26 (11th Cir. 2002); 20 C.F.R § 404.1529.

Additionally, a claimant's daily activities may be considered in evaluating and discrediting complaints of disabling pain. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (finding that the ALJ may include recent work experience during the period of alleged disability in assessing the claimant's credibility).

Regarding medical evidence, the ALJ must give the opinions of the claimant's treating physicians substantial weight unless "good cause" exists against doing so. "Good cause" is found when "the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding" and also "where the doctor's opinions were conclusory or inconsistent with their own medical records." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

The Social Security Administration has clarified that in certain circumstances, the opinions of the state agency physicians

> may be entitled to greater weight than a treating source's medical opinion if the State agency medical [] consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96-6P 1996 WL 374180 (S.S.A., July 2, 1996).

Lastly, the Eleventh Circuit has established that although chiropractors' opinions may be

viewed as evidence, chiropractors are not medical sources and cannot be *relied upon* for disabilities purposes.  *See* 20 C.F.R. §§ 404.1513, 416.913; *Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004).*

## V. FACTS

The claimant had a high school education with some college work and was fifty-seven years old at the time of the administrative hearing in April, 2011. (R.113, 128).  Her past work experience includes employment as a certified nurse's assistant, a day care worker, and a home health aide. (R.118). The claimant originally alleged she was unable to work because of back pain, blurry vision, and pain in her extremities; however, the claimant testified at the hearing that she has continued to work at a day care at least through March, 2011. (R.118, 113-114).

### *Physical Limitations*

On April 16, 2009, the claimant was admitted to Huntsville Hospital via the emergency room with hyperemesis. While hospitalized, the claimant complained of numbness and tingling in her extremities, and a neurologic evaluation diagnosed the claimant with diabetic neuropathy. During her hospital stay on April 23, 2009, the claimant was diagnosed with new onset diabetes mellitus and hyperlipidemia.  Dr. Benjamin Steward Fail, MD, recommended a diet change and a follow-up with a neurologist, and he prescribed the claimant regular insulin. (R. 280-81).

On June 10, 2009, Dr. Fail declined to perform an evaluation of the claimant for the purposes of this disability claim. (R. 317).

On June 12, 2009, Dr. Steven W. Simpson, O.D.,  performed an eye examination on the claimant, who complained of blurred vision. The examination determined that the claimant's uncorrected visual acuity was 20/400, with a best acuity being 20/30 and 20/50 in the right and left

eyes, respectively. Dr. Simpson recommended that the claimant see an ophthalmologist to evaluate her for cataracts and glaucoma.  Dr. Simpson noted that the claimant refused to wear glasses after he assured her that glasses would improve her vision. He further stated in his report that he did not see any visual disturbance bad enough to cause disability. (R. 306).

On July 10, 2009, the claimant filled out a Function Report for the Social Security Administration. The claimant stated that she lived alone in a house, fixed meals for herself, went outside daily, drove her car, shopped for groceries and other necessities once a week, and went to church almost every Sunday. The claimant complained of pain and difficulty in performing these tasks, and indicated that her injuries affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, seeing, memory, completing tasks, concentration, understanding, and getting along with others. However, the claimant further indicated that she was presently working at ARC, a service that helps people with intellectual or developmental disabilities, in Madison County. (R. 235-42).

On August 25, 2009, Dr. Marlin D. Gill, MD, performed a consultative physical examination of the claimant at the request of the Disability Determination Service. The claimant complained of pain in her hands and feet, blurred vision, and low back pain. She claimed that these problems increased with standing, walking, bending, and sitting in one position too long. Upon examination, the claimant's gait was normal and she could walk unassisted. Her arms exercised a full range of motion with 5/5 strength bilaterally, and her grip had a strength of 4/5 bilaterally. Her legs were normal and exercised 4/5 strength bilaterally, and the claimant was able to squat one-third of the way down and return to standing. The claimant also complained of pain with lumbar movement and tenderness of the feet. At the time of Dr. Gill's examination, the claimant reported to working five

days per week for six hours each day, caring for special needs people. She stated that she lived alone, and was able to drive and shop by herself, but that she could only sit or stand for thirty minutes at a time. (R. 318-19).

On September 14, 2009, Dr. Prem Kumar Gulati, MD, performed an x-ray on the claimant's lumbar spine at the request of the Disability Determination Service. The x-ray showed degenerative disc disease at L5 S1. (R. 323-25).

On March 16, 2010, the claimant returned to Huntsville Hospital emergency room complaining of back pain. (R. 353). Dr. Fail prescribed the claimant pain relievers and muscle relaxers. (R. 355). The nurse's notes from the claimant's hospital visit indicated a steady gait but mild discomfort. (R. 363-64).

On September 20, 2010, the claimant again entered the emergency room of Huntsville Hospital after being involved in a motor vehicle accident. (R. 341). Upon admission, the claimant had no significant swelling or tenderness in her extremities. (R. 343). An examination determined that the claimant had osteophytosis from C5 to T1 and thoracic spondylosis. (R. 350).

Two days later, on September 22, 2010, the claimant went to Crestwood Medical Center complaining of back pain, bilateral lower extremity pain, and aches and pains associated with the recent motor vehicle accident. The lab tests showed no significant abnormalities, and the claimant was discharged that day with prescriptions to reduce nausea and relieve moderate pain. (R. 376-77). Upon discharge, the claimant denied any numbness or tingling and was able to move all four extremities equally. (R. 380).

On November 3, 2010, the claimant returned to Dr. Fail complaining of back, neck, and leg pain associated with the car accident. Dr. Fail recommended that the claimant continue to see a

chiropractor, and also noted that the chiropractor restricted the claimant's lifting capability to ten pounds. (R. 404-405).

On November 11, 2010, the claimant saw Dr. Theodros Mengesha, MD, for further evaluation and treatment following her motor vehicle accidence. Dr. Mengesha performed a neurological evaluation of cervical radiculopathy. He noted that the claimant had low back surgery in 1986 and that her back has improved since then. Dr. Mengesha also noted that the claimant had normal gait and could walk on heels, toes, and flat without difficulty. Dr. Mengesha's notes indicate that the claimant was employed at the time of the appointment, but no further details exist as to where she was employed. (R. 409-10). Based on his examination, Dr. Mengesha suspected that the claimant was suffering from cervical radiculopathy and recommended MRIs of her cervical and lumbar spine. After performing the recommended MRI, Dr. Mengesha's report on November 30, 2010 concluded that the claimant's cervical spine had multifocal degenerative changes and bilateral neural foraminal narrowing, and that her lumbar spine also had degenerative changes with minimal bilateral neural foraminal narrowing. A handwritten note on the final report indicates that the claimant was referred to a neurosurgeon following her MRI. (R. 412-13).

On January 19, 2011, the claimant had a followup appointment with Dr. Mengesha. His evaluation confirmed that the claimant was referred to, but had not yet seen, a neurosurgeon. Dr. Mengesha's examination showed 5/5 strength in all four extremities with normal muscle bulk and tone and normal gait. The examination also showed a positive Spurling's sign, which is the result of an evaluation for cervical nerve root impingement that elicits radicular arm pain from lateral neck rotation and axial compression. Dr. Mengesha determined that the claimant's cervical radiculopathy was from either degenerative disc disease of the spine or cervical spondylolisthesis. Dr. Mengesha

8

advised the claimant to do neck exercises and see a neurosurgeon for potential surgery. (R. 406).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 14). The hearing took place on April 11, 2011. (R. 110). The claimant testified that she was unable to work on a regular basis because of her back, blurry eyesight, and pain associated with diabetes. (R. 118). She testified that the pain extended to her neck, lower back, arms, legs, and also included headaches. The claimant further testified that her hands sometimes felt arthritic and that she had trouble holding or lifting small objects. (R. 120).

Regarding postural maneuvers, the claimant testified that she can sit for approximately twenty minutes, stand for fifteen minutes, walk about the distance of a street block, and cannot bend. The claimant testified that she spends most of the day lying on her back and resting. (R. 120-22).

The claimant indicated that she could make her own meals and can keep the house clean, although with some pain associated.  The claimant further testified that she was taking pain medications that caused stomach bleeding. On a scale of zero to ten, the claimant stated that her average pain is an eight. (R. 121-22).

Regarding recent employment, the claimant testified that she had been working at a daycare facility full time until a month prior to the hearing. Her duties at the daycare included feeding, changing, teaching, and playing with young children. The claimant testified that she stopped working due to pain. The claimant's other recent work experience included part-time work at other daycare facilities and an elderly care service. (R. 113-15). The claimant also testified that she had previously applied for unemployment benefits and workman's compensation benefits. (R. 117).

After reviewing the past relevant work of the claimant, the vocational expert, Patsy Bramlett, first testified that the claimant's job as a certified nurse's assistant in a nursing home is medium, semi-skilled work. Next, Ms. Bramlett stated that the claimant's work as a day care worker was deemed light, semi-skilled labor. Also, Ms. Bramlett testified that a home health aide or sitter with the elderly is medium, lower semi-skilled work. When asked if any transferable skills existed, Ms. Bramlett testified that no skills could transfer to sedentary work. (R. 118-19).

The ALJ then gave Ms. Bramlett two hypothetical situations to consider. First the ALJ asked Ms. Bramlett to assume that the claimant was the same age as the actual claimant with the same educational background and past work experience; had the capability to lift twenty pounds occasionally and ten pounds frequently; could stand six of eight hours and walk six of eight hours; occasionally could climb, balance, stoop, kneel, crouch, and crawl; and never could encounter ropes, ladders, or scaffolds. Ms. Bramlett testified that while those limitations could not apply to a home health aide or a certified nurse's assistant, a teacher or day care worker could fit those limitations. (R. 123-24).

The second hypothetical was the same as the first, but the individual would have to rest at various times during the day, requiring absences from the work station. Also, the second hypothetical gave the claimant sole discretion in the frequency and duration of the breaks. Furthermore, these unscheduled breaks would occur on a daily basis. Ms. Bramlett testified that unscheduled breaks would eliminate all jobs for the claimant. (R. 124).

*The ALJ's Decision*

On May 13, 2011, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 27). First, the ALJ found that the claimant had not engaged in substantial

gainful activity since the alleged onset of her disability. Next, the ALJ decided that the claimant's diabetes mellitus (type II), diabetic neuropathy, and degenerative disc disease (cervical and lumbar) qualified as severe impairments. The ALJ found the claimant's loss of visual acuity a non-severe impairment. (R. 21-23).

The ALJ concluded that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. Specifically, concerning the claimant's degenerative disc disease, the requirements of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis were not found. Additionally, the claimant exhibited 5/5 strength in all four extremities with normal muscle bulk and tone and could walk unassisted. Regarding the claimant's type II diabetes, the ALJ found no evidence of significant or persistent disorganization of motor function in her extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. The ALJ also noted that the claimant has not been diagnosed with acidosis or retinitis proliferans, and, therefore, does not meet the listing requirements.

Although already determined non-severe, the ALJ reviewed the claimant's loss of visual acuity under the requirements and concluded that at best correction, the claimant's acuity does not meet the requirement of 20/200 or worse. Because of these findings, the ALJ determined that the claimant did not have an impairment or combination of impairments that meet the listed impairments. (R. 23).

Next, the ALJ decided that the claimant has the residual functional capacity to perform light work. The ALJ specifically stated that the claimant could lift or carry up to twenty pounds occasionally and ten pounds frequently; sit, stand, or walk up to six hours per eight-hour workday; never climb ropes, ladders, or scaffolds; occasionally may climb ramps and stairs, balance, stoop,

kneel, crouch, and crawl; and never can be exposed to hazards.(R. 23-24).

The ALJ followed a two-step process in considering the claimant's symptoms to establish the claimant's residual functional capacity. First, the ALJ examined whether an underlying medically determinable physical or mental impairment(s) exists that reasonably could be expected to produce the claimant's pain or other symptoms, and found that the claimant's diabetes, diabetic neuropathy, and cervical and lumbar degenerative disc disease reasonably could be expected to cause the alleged symptoms.  Next, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to limit the claimant's functioning. During this process, the ALJ found that the claimant's symptoms were not substantiated by objective medical evidence, and, therefore, considered the entire case record in determining credibility. (R. 24-5).

Because the claimant alleged that her diabetes, vision, back pain, and weakened extremities limited her ability to work, the ALJ first assessed the claimant's credibility. Although the ALJ determined that the claimant's impairments could reasonably be expected to cause the alleged symptoms, the ALJ found that the claimant's statements regarding the intensity, persistence, and effective limitations of her symptoms were not credible in determining the residual functional capacity. (R. 24).

The ALJ based his determination primarily on evidence of the claimant's daily activities and recent work experience. Although the claimant testified at the hearing that she spent most of the day in bed due to her symptoms, the claimant's Function Report from July of 2009 indicated that the claimant lived alone and was able to prepare her own meals, drive, take medications, do laundry, and go grocery shopping. The ALJ noted that the claimant did not indicate at the hearing that she could no longer perform those activities. Additionally, the claimant's medical record indicated that she was

working five days per week for six hours each day in August of 2009 as a care giver for people with special needs, and the claimant testified at the hearing that she was a daycare worker as recently as March 2011. Based on the claimant's daily activities and continued employment, the ALJ determined that the claimant was capable of exerting herself at a level somewhat greater than what the claimant had alleged at the hearing, discrediting the claimant's subjective test of her limitations. (R. 24-25).

Besides considering the daily activities and recent employment, the ALJ also looked to the claimant's medical record as a whole to determine her residual functional capacity. The ALJ stated that based on the claimant's entire medical record, the claimant's symptoms and limitations did not justify a limit of sedentary work. For example, the ALJ noted that the claimant had not been hospitalized for her condition since her initial diagnosis of diabetes. The ALJ indicated that claimant's degenerative disc disease and diabetic neuropathy also showed signs of improvement, since the claimant's gait was normal and she could walk unassisted as early as August of 2009. The ALJ also noted that in 2009, claimant's arms had full range of motion with 5/5 strength and a grip strength of 4/5 bilaterally. Additionally, the ALJ considered that although the claimant had some limited range of motion in her back and could only squat down one-third of the way down, her leg strength was 4/5 bilaterally. (R. 25-26).

The ALJ noted that during the claimant's most recent physical examination in January of 2011, she exhibited 5/5 strength in all four extremities with normal muscle bulk and tone and had normal gait and coordination. The ALJ found that the entirety of the record showed that the claimant can perform daily activities, work as a care giver, and maintain stable health conditions. The ALJ, therefore, found that the claimant is capable of a higher residual functional capacity than the claimant alleged. (R. 25-26).

13

The ALJ next explained how he distributed the weight to opinions of the medical record. First, the ALJ gave great weight to Dr. Simpson, the claimant's optometrist who stated that the claimant's visual acuity was not bad enough to cause disability and also noted that the claimant refused to wear eyeglasses. The ALJ gave Dr. Simpson's opinion great weight because of his specialty in the field, use of clinical diagnostic techniques, and personal examination of the claimant. (R. 26).

The ALJ then considered the State agency medical consultant, Dr. Robert H. Heilpern. The ALJ gave great weight to Dr. Heilpern's opinion regarding exertional limitations. The ALJ concluded that the claimant was capable of performing light work based on Dr. Heilpern's thorough review of the claimant's physical examinations and x-rays. However, the ALJ gave less weight to Dr. Heilpern's finding that the claimant can never use ramps or stairs because the ALJ did not find support for the finding in the record; therefore, the ALJ established that the claimant could occasionally use ramps or stairs instead of never. The ALJ also disagreed with Dr. Heilpern's recommendation regarding the claimant's ability to frequently balance, and, after finding no support for the recommendation from an objective view of the record, gave the claimant a greater limitation of occasionally balancing. (R. 26).

The ALJ found it significant that the claimant's medical record did not include any indication that the claimant was disabled or could not perform light work activity. Moreover, the claimant's medical record did not include *any* express opinions by her treating physicians, only progress notes and results from medical evaluations. By specifically reviewing the notes made by Dr. Simpson, Dr. Fail, Dr. Heilpern, Dr. Gill, and Dr. Mengesha, the ALJ determined that the claimant is capable of performing light work with some specified limitations. (R. 26).

14

## VI. DISCUSSION

The claimant argues that the ALJ incorrectly gave more weight to the opinions of the state agency physician, Dr. Heilpern, than the treatment note of the claimant's treating physician, Dr. Fail, and also alleges that the ALJ improperly determined that the claimant is capable of exerting a light level of work. To the contrary, this court finds that the ALJ properly concluded that the claimant is not disabled and can perform light work and that the substantial evidence supports his decision.

**I.**     **The ALJ did not commit a reversible error when he gave significant weight to Dr. Heilpern's opinions but did not mention Dr. Fail's treatment note regarding the chiropractor's ten pound weight restriction**.

The claimant alleges that the ALJ used improper legal standards in weighing the evidence. More specifically, the claimant argues that the ALJ did not give enough weight to her treating physician's note that limited the claimant to lifting ten pounds and instead incorrectly relied on the opinions of the consulting state agency physician. The Eleventh Circuit has determined that "[t]he opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable period of time, should be accorded considerable weight." *Chester v. Bowen*, 792 F.2d 129 (11th Cir. 1986).

However, in some instances the state agency physician may be given more weight than the claimant's treating physician. For example, the Social Security Administration clarified that "if the State agency medical [] consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source," the state agency physician's opinions may be weighed more substantially than the treating physician's. SSR 96-6P 1996 WL 374180 (S.S.A July 2, 1996). The state agency physician's opinion

may also be preferred when "the opinion of a treating physician . . . is so brief and conclusory that it lacks persuasive weight or where it is unsubstantiated by any clinical or laboratory findings" or "when the evidence supports a contrary conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *see also Kirkland v. Weinberger*, 480 F.2d 46, 49 (5th Cir.), *cert. denied*, 414 U.S. 913 (1973).

In the case at hand, the ALJ gave significant weight to the opinions of the state agency physician, Dr. Heilpern. While Dr. Heilpern was not a treating physician, he clearly cited and discussed how he formed his opinions. The medical evidence Dr. Heilpern reviewed also was more complete than any of the other doctors' notes, since the evidence included the opinions, physical examinations, and x-rays performed by Dr. Gill, Dr. Gulati, and Dr. Fail. (R. 327-28). As the claimant's treating physician, Dr. Fail did not review the claimant's medical record in its entirety, and actually declined to perform an examination of the claimant for the purposes of this disability claim. (R. 317). Because Dr. Heilpern reviewed and cited the examinations of treating physicians and specialists and, therefore, had a more complete overview of the claimant's medical problems, the ALJ correctly gave significant weight to Dr. Heilpern's recommendations.

The ALJ did not rely fully on Dr. Heilpern's recommendations though, as seen by the ALJ's final determination of the claimant's residual functional capacity. Specifically, the ALJ disagreed with Dr. Heilpern's postural limitations, and subsequently determined less restrictive climbing limitations but more restrictive balancing limitations, based on the evidence of the entire record. (R. 26). As seen by his final determination, the ALJ properly gave the state agency physician significant weight because Dr. Heilpern had a more complete reading of the claimant's medical record, but the ALJ also properly disagreed with the state agency physician when the evidence as a whole supported

16

contrary findings.

Although the ALJ did not refer specifically to the weight he gave Dr. Fail's office note regarding the chiropractor's reported restriction of ten pounds, his failure to do so was not reversible error. The relevant part of Dr. Fail's handwritten progress note on November 3, 2010 simply states, "chiropractor restricts to 10lbs." (R. 405). The document that includes this information indicates that it came only from the claimant's chiropractor, and the record contains no indication that Dr. Fail adopted that view or had any medical reason for agreeing with it. The ALJ is allowed to disregard a treating physician's statement when that statement is brief, conclusory, and unsubstantiated by objective medical findings. *Bloodsworth*, 703 F.2d at 1240. In this instance, the note is a conclusory opinion of a third party with no medical evidence provided to support the finding. Furthermore, the chiropractor is unnamed and the medical record contained no original source from the claimant's chiropractor. The law has clearly established that while chiropractor's opinions may be taken into account, chiropractors are not medical sources and cannot be relied upon for disabilities purposes. *See* 20 C.F.R. §§ 404.1513, 416.913; *Crawford v. Comm'r of Soc. Sec.,* 363 F.3d 1155, 1160 (11th Cir. 2004).

The claimant alleges that the ALJ did not give proper weight to Dr. Fail's recommendations in general, but the only aspect of Dr. Fail's medical evidence contrary to the ALJ's determinations is the progress note indicating a ten pound weight restriction from the claimant's chiropractor. Because only a handwritten progress note mentioned a weight restriction and the record does not include medical evidence from the claimant's chiropractor, the origin and accuracy of the statement is unknown. Regardless of the uncertainty behind the meaning of the note, Dr. Fail did not expressly adopt the chiropractor's restriction and, therefore, the limitation is not Dr. Fail's opinion. Thus, this

court finds that the ALJ correctly disregarded Dr. Fail's progress note regarding the stated weight restriction because no medical evidence in the record supported such a restriction. The ALJ gave correct weight to both the state agency physician and the claimant's treating physician, applied the correct legal standards, and substantial evidence supports his decision.

## II.    The ALJ properly applied the Eleventh Circuit's pain standard in discrediting the claimant's subjective testimony of alleged severity of her pain and symptoms.

The claimant argues that the ALJ improperly discredited the claimant's testimony regarding her alleged pain and limitations. Under the Eleventh Circuit's pain standard, the ALJ must evaluate pain and other subjective complaints by considering whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1125-26 (11th Cir. 2002); 20 C.F.R § 404.1529.

While the ALJ found that the claimant's impairments could reasonably be expected to cause the claimant's symptoms, the ALJ concluded that the intensity and persistence appeared to be exaggerated. (R. 25). The claimant's testimony at the ALJ hearing supports the ALJ's findings, especially regarding the claimant's recent work experience. Although the claimant testified that she was unable to work on a regular basis because of her back, blurry eyesight, and pain associated with diabetes, she also testified that she worked at a daycare facility full time until a month prior to the hearing, where her duties included feeding, changing, teaching, and playing with young children. (R. 113-15, 118). Furthermore, the record indicates that the claimant lives in a house alone and is able

to clean, do laundry, cook, shop, and drive. (R. 318). Based on the claimant's recent employment and daily lifestyle, the ALJ properly determined that the claimant is not disabled (R. 25).

   The ALJ also assessed the claimant's medical record as a whole and did not find sufficient evidence to show that the claimant is incapable of performing light work. (R. 22-26). For instance, the ALJ found Dr. Marlin Gill's  physical examination of the claimant in 2009 significant, because Dr. Gill found that the claimant had a normal gait, could walk unassisted, had full range of motion in her arms, and had 5/5 strength in her arms. The ALJ also considered Dr. Gill's 2009 findings that the claimant's hands appeared normal and that she had a grip strength of 4/5 bilaterally. (R. 25).

   The ALJ additionally took into account that at the claimant's most recent doctor's visit with Dr. Mengesha in her medical record, dated January of 2011, she showed full 5/5 strength, normal muscle bulk and tone, and normal gait and coordination. (R. 406). While no dispute exists about the claimant having the severe impairments of diabetes (type II), degenerative disc disease, and diabetic neuropathy, the medical record indicates that the claimant exhibited full arm and leg strength, no recent hospital visits, and had generally improving conditions since 2009.

   Moreover, the claimant's medical record, recent work experience, and daily lifestyle, when taken together, contradict the claimant's subjective testimony. For example, the claimant alleged at the ALJ hearing that she spent most of the day resting, could hardly walk to the refrigerator, and could not lift anything with her hands. (R. 120-22). However, the claimant also testified at the hearing that she was working at a daycare as recently as a month before the hearing where her duties included feeding, teaching, and playing with young children as a full time job, which disproves the claimant's assertion that she spent most of the day in bed. (113-14). Additionally, the claimant's Function Report from July of 2009 indicated that she was capable of preparing meals of multiple

19

courses for herself, discrediting her allegation that she could barely walk to the kitchen. (R. 237).

Finally, Dr. Mengesha's findings in 2011 regarding the claimant's full arm strength and 4/5 grip

strength contradict the claimant's testimony about her inability to lift anything. (R. 406). These

discrepancies between the unremarkable medical findings and the claimant's subjective testimony

further show that the ALJ properly applied the Eleventh Circuit's pain standard in discrediting the

claimant. This court finds that substantial evidence exists to support the ALJ's decision to discredit

the claimant's subjective testimony.

### III.    The ALJ properly determined the claimant's residual functional capacity as light exertion level.

Although the claimant alleges that the proper level of exertion is sedentary instead of light,

no evidence exists in the record to support such a finding, and the ALJ correctly determined the

claimant's exertion level as light. Based on the claimant's *alleged* symptoms and limitations alone,

her exertion level could have been determined sedentary; however, once the ALJ properly considered

and discounted Dr. Fail's progress note mentioning a chiropractor's weight restriction and also

discredited the claimant's subjective testimony regarding her limitations, the remaining substantial

evidence as a whole supports the ALJ's determination of a light exertion level.

"Substantial evidence is more than a scintilla, but less than a preponderance. It is such

relevant evidence as a reasonable person would accept as adequate to support a conclusion."

*Bloodsworth v. Heckler*, 703 F.2d 1233,1239 (11th Cir. 1983) (citing *Richardson v. Perales*, 402

U.S. 389, 401 (1971). Because the court has already determined that the ALJ properly considered

the weight given to the claimant's treating and consulting state agency physicians, and properly

discounted the claimant's subjective testimony and Dr. Fail's progress note, more than substantial

evidence supports the light exertion level given by the ALJ.

### VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 26th day of March, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE